IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| STEVEN SREDL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04-4146-CV-C-NKL |
| | ) | |
| CORRECTIONAL MEDICAL SERVICES, INC., | ) ) | |
| | ) | |
| LANA A. ZERRER, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NELO LAGO CONOL, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

Pending before the Court is Correctional Medical Services, Inc.'s ("CMS") and Lana A. Zerrer's ("Zerrer") (collectively "Defendants") Motion for Summary Judgment[1] [Doc. # 34]. For the reasons set forth below, the Court grants Defendants' Motion.

Also pending before the Court is Defendants' Motion to Strike certain portions of Steven Sredl's ("Sredl") affidavit that he submitted in support of his Opposition to Defendants' Motion [Doc. # 48]. For the reasons set forth below, the Court denies Defendants' Motion to Strike.

**I. Background**

---

[1]Nelo Lago Conol does not join in Defendants' pending Motion.

1

### A. Sredl's Right Elbow Injury and Medical Care

Sredl was an inmate at the Missouri Department of Corrections Algoa Correctional Center ("ACC"), located in Jefferson City, Missouri. On May 20, 2002, Sredl fell during a softball game at ACC and injured his right arm.

#### 1. May 2002 Treatments

After his fall, Sredl completed a Medical Services Request ("MSR") form and took the form to the Medical Unit at ACC. Sredl was treated on May 20 by a nurse who ordered 1-2 tablets of 325mg of aspirin and 1-2 tablets of 200mg ibuprofen as needed for pain and swelling to be taken every 4-6 hours. The nurse splinted Sredl's arm, recommended ice and instructed him to return to the Medical Unit if he was not better. Later on May 20, a physician in the Medical Unit amended the nurse's treatment plan and increased Sredl's ibuprofen to 600mg and Sredl was administered that dosage later in the day.

The next day on May 21, Zerrer, a Medical Doctor, provided medical treatment to Sredl at the Medical Unit. Zerrer's records reveal that Sredl's elbow was mildly swollen and that he was unable to move it. Sredl showed no signs of bruising or erthyma and his wrist was normal with no tenderness, but some pain with flexion. Zerrer determined that Sredl had an arm injury but she ruled out a fracture. She further increased Sredl's ibuprofen intake from 600mg to 800mg and she ordered a routine x-ray examination of Sredl's elbow, lower arm, and wrist. It is undisputed that Zerrer's treatment of Sredl was limited to her interaction with him on May 21, and her doctor-patient relationship with

him ended after that day. Later in May 2002, Zerrer left her employment with CMS due to her obligations with the United States Air Force.

According to deposition testimony from CMS's corporate representative, Zerrer could have ordered that Sredl's x-ray be completed immediately rather than noting it as a routine x-ray. According to Sredl, Zerrer did not warn him that there would be any risk associated with delaying an x-ray. However, in her deposition, Zerrer testified she did not believe there were any substantial risks associated with postponing an x-ray for an arm fracture if conservative treatment options were undertaken during the intervening time between the injury and the x-ray. She also opined that she did not believe the week-long delay in his x-ray negatively impacted his recovery and that the reason it is ideal for an injured person to be x-rayed sooner than one week is so the treating physician has the information and not because it negatively impacts recovery.

Regarding her departure from CMS, Zerrer testified that it was not necessary to follow-up on Sredl's case nor was it necessary to advise her colleagues about it. She stated that, because she had ordered an x-ray, she knew that the site physician that was on duty when Sredl returned from his x-ray would be there to evaluate him and his x-ray results. She stated this was normal CMS procedure. Thus, according to Zerrer, her treatment file of Sredl and the fact that a physician would be there to consult with him when he returned from his x-ray provided sufficient assurance that his treatment would be monitored.

From May 21 through May 28, 2002, Sredl continued to receive pain medication

from CMS employees and he continued to wear his sling as prescribed. On May 24, Sredl filed a second MSR for complaints related to his right arm and he was seen by a nurse at the Medical Unit. The nurse found no impaired circulation, displaced fracture, dislocation, or shock. The nurse recommended continued immobilization, splint, no traction, and ice. The nurse noted that x-rays were ordered and Sredl was taking 800mg of ibuprofen for his pain.

Sredl does not recall receiving the follow-up care from the nurse on May 24, nor does he remember filling out the second MSR form.

On May 28, Sredl was transported by the Department of Corrections ("DOC") to an outside facility for x-rays of his right elbow, lower arm, and wrist. The x-ray revealed normal results for his upper right arm and wrist. The x-ray of Sredl's lower arm reported a "slight deformity of the radial head. Non-displaced transverse fracture cannot be excluded. Clinical correlation is suggested. The remaining bony structures and articular spaces are intact." The x-ray of Sredl's elbow reported "slight deformity of the radial head is identified. Whether this is due to healed fracture deformity or recent fracture is uncertain . . . . There is an anterior fat pad sign suggestive of joint effusion. The remaining bony structures and articular spaces are intact."

On May 30, Nelo Conol ("Conol"), who was also a physician at ACC in the Medical Unit, examined Sredl. The parties dispute whether Sredl reported extreme pain during his visit to Conol. Nonetheless, they agree that Conol's treatment notes indicate that Sredl's right arm had no significant swelling, erythema and fairly good flexion and

extension on passive movements of the elbow.  Sredl did express pain when Conol performed pronation and suppination movements.

On that same day, DOC again transported Sredl to an outside facility for an x-ray of his right elbow, lower arm, and wrist.  The second x-ray revealed better delineation of the radial head and the medial margins of the radial head to be slightly depressed with continued evidence of joint effusion.

### *2.     June 2002 Treatments*

A few days later on June 3, Conol reviewed the results of the second x-ray with Sredl.  He assessed Sredl's injury as a fracture of the proximal head of the right radius with mild displacement.  Conol contacted orthopedic surgeon, Thomas Kramer ("Kramer"), for a consultation on Sredl's injury and medical treatment plan.  Kramer recommended conservative treatment for Sredl's injury.  Conol prescribed and recommended to Sredl a posterior splint case to be applied to his right arm.

According to Defendants, Sredl refused the splint cast.  In his Opposition, Sredl states that he refused the splint cast because he was also asked to sign an Informed Consent and Release form ("the Form") at the same time as receiving the splint cast.  Sredl believed this was a waiver of liability by CMS and he refused to sign it or receive the splint cast.  According to Sredl, Conol then submitted to him a Refusal of Treatment form for him to sign, which also contained a waiver of liability for CMS.  Sredl initially refused to sign it, but after being verbally abused by Conol and threatened with a conduct violation, he acquiesced and signed the Refusal of Treatment form.  Defendants dispute

5

that this exchange occurred and instead argue that Sredl simply refused the splint cast.

It is undisputed that, for whatever reason, Sredl did not receive a splint cast on his right arm on June 3. As an alternative treatment, Conol prescribed for Sredl a right arm sling for six weeks, in addition to instructions for lay-in for six weeks, no lifting for six weeks, cold compresses to the right elbow for fifteen minutes three to four times a day for five days. Conol also called for Sredl to undergo another x-ray in three weeks and for all the x-ray films to be available for the radiologist to read. Conol also required that Sredl be available to be called out for re-evaluation.

According to Sredl, Conol told him during the June 3 examination that it was too late to correctly repair the injury to his arm because it had already healed improperly and that is why he simply recommended the application of the splint cast.

On June 5, Sredl filed an MSR form for a right arm cast.

On June 7, Sredl met with Conol who, according to Sredl, inexplicably refused to apply a cast to his right arm. Defendants dispute this allegation. The parties do not dispute that Conol's examination of Sredl's right arm on June 7 revealed full range of motion of the elbow joint with some localized pain on active suppination and pronation movements. There was no significant swelling or tenderness on the radial head. The arm was relatively asymptomatic.

On June 10, Sredl filed an MSR form for a right arm cast.

On June 11, Sredl filed an MSR form complaining of right arm pain. On that same day, Sredl was treated by a nurse at the Medical Unit who in turn referred Sredl to a

6

physician for medical care. Sredl continued to be on pain medication during this time period, including 800mg of Motrin and 300mg of Tegretol.

Conol again examined Sredl on June 17. Conol consulted with Kramer who advised that a right arm cast would not be inappropriate for Sredl's injury. Sredl alleges that during the June 17 appointment, Conol again inexplicably refused to apply the cast to his right arm.[2]

On June 25, Sredl consulted with Conol during which Conol applied a splint cast to Sredl's right arm. According to Sredl, he was provided the splint cast only after he agreed to sign the Form provided to him. There is no dispute that Sredl signed the document, but the parties appear to dispute the conditions under which Sredl signed it.

During the June 25 visit, Conol ordered another set of x-rays on Sredl's right elbow. Those x-rays were compared to Sredl's May 20 x-rays and the comparison revealed that there was no obvious change in the position or apposition of the fracture site.

On June 26, another x-ray was performed pursuant to Conol's instructions and it revealed normal findings.

### 3. *July 2002 Treatments*

On July 9, Conol saw Sredl and removed the splint cast from his right arm. Conol

---

[2]Sredl allegedly then asked his mother and defense counsel to contact ACC to complain, but there is no evidence that they ever undertook such a complaint or that ACC received one on Sredl's behalf.

7

reported that the elbow showed stable positioning, fairly good range of motion, "soreness," and no significant pain. Conol recommended two additional weeks of lay-in with a possible three-week extension, a sling for three weeks and exercise of the elbow.

Sredl was treated by a nurse in the Medical Unit on July 15 and July 19 because he was requesting referral to an orthopedic surgeon. The nurse advised Sredl that additional x-rays had been ordered and that his right arm was unchanged since his last examination with Conol.

On July 25, another x-ray was taken of Sredl's right arm and compared to his x-ray results from May 28. The comparison revealed that Sredl's fracture of the proximal radius showed no change in position of the fragments and adequate bone union for the age of the fracture.

Sredl was seen on July 29 by CMS staff at the Medical Unit for concerns related to his right elbow, refills of his 200mg ibuprofen and a request to follow-up on the most recent x-rays.

### 4. *August 2002 Treatments*

On August 1 and August 5, Sredl was seen by CMS staff at the Medical Unit for concerns related to his right elbow, refills of his 200mg ibuprofen and a request to follow-up on the most recent x-rays.

On August 23, Sredl was examined by Conol. Sredl stated that his arm had "healed crooked" and he wanted to see a specialist. Conol's examination revealed there was no gross deformity in the elbow. The elbow had improved range of motion of 180

8

degrees and good flexion. Nonetheless, Conol obtained permission to allow Sredl to consult with Kramer, an orthopedic surgeon.

CMS staff advised Sredl on August 26 that they had made an appointment for him to see Kramer. Between August 26 and December 2, Sredl was treated by CMS staff for his right elbow concerns and various other unrelated medical issues.

### 5. *December 2002 Treatments*

On December 5, Sredl attended his scheduled appointment with Kramer. Kramer performed an examination of Kramer's right elbow, which revealed a healed radial head fracture with minimal displacement and lateral epicondylitis, which is commonly known as "tennis elbow." Kramer recommended that Sredl treat his elbow with ice, massage, and stretching and strengthening exercises. Kramer and Sredl discussed the conservative treatment of Sredl's injury and Kramer did not recommend surgery because it would lead to additional pain and scarring.

From December 5 to May 19, 2003, Sredl made no complaints to CMS regarding his right elbow fracture. Sredl continued to receive his medication to alleviate his pain during this time period.

### 6. *2003 Treatments*

On May 20, 2003, Sredl complained about pain in his right arm. Sredl requested a lay-in, lifting restrictions, and an x-ray. On May 27, Conol reviewed Sredl's chart and determined that his complaints were resolved.

Sredl was transferred to Missouri Eastern Correctional Center ("MECC") in June

2003 and he continued under the care of CMS physicians at that facility, including an additional set of x-rays that were performed on October 7.

Sredl advised his new doctor at MECC, John Williams ("Williams"), that he was not doing the exercises recommended by Kramer. Williams advised Sredl to perform the exercises and continue on his medication. Williams did not believe any further treatment was necessary.

On December 6, Sredl's right elbow was again x-rayed under the supervision of another CMS physician.

### B. Left Elbow Injury and Thomas Turnbaugh ("Turnbaugh")

Turnbaugh is a surgeon under contract with CMS to provide orthopedic care to inmates. In December 2003, Sredl injured his left elbow and Turnbaugh treated him for his injury. Sredl's left elbow injury is not the subject of his lawsuit.

As part of his treatment of Sredl's left elbow, Turnbaugh also analyzed the x-rays of Sredl's right elbow and he examined the elbow. Regarding Sredl's right arm, Turnbaugh noted:

> He has a 20 degree flexion contracture and has lost about 15 degrees of supination and about 15 degrees of pronation. The arm is uncomfortable. X-rays are obtained of the right arm and he has a malunion of a radial head fracture that is displaced and now is developing post-traumatic arthritis. We have talked about this. I think he first needs physical therapy. One could do a radial head excision but this will produce some weakness in the dominant arm of a rather young man who hopes to get a job doing manual labor after he articulates from prison. One can also excise the joint capsule of the elbow and improve this situation.

*See* Pl. Opp. [Doc. # 44], Ex. 6 at p. 14. Turnbaugh recommended physical therapy for

10

Sredl's right arm, but physical therapy has never been arranged for Sredl nor has an excision procedure.

Turnbaugh has never been deposed because counsel for Sredl cancelled the deposition. Nonetheless, Sredl submits an affidavit from Turnbaugh in support of his Opposition. According to the affidavit, there are two ways to treat displaced fracture of the radial head: surgery followed by immobilization and physical therapy, or conservative treatment which consists of immobilization followed by physical therapy.

**D.     Sredl's Third Amended Complaint [Doc. # 29]**

In his Third Amended Complaint, Sredl asserts three claims against Defendants and Conol. All of Sredl's claims are brought under 42 U.S.C. § 1983 for alleged deprivation of his constitutional rights. Sredl pursues Count I against Zerrer because she did not order an immediate x-ray of Sredl's arm and she did not follow-through with his treatment. Sredl pursues Count II against CMS because it allegedly had in place policies that violated his constitutional rights. Specifically, Sredl states that CMS failed to maintain any practice or policy to ensure reasonably prompt treatment of his arm injury and, through that failure, it violated his civil rights.

Sredl pursues Count III against Conol, but Conol has never been served by Sredl. *See* Pl. Opp. [Doc. # 44] at p. 4, n. 1. In his Opposition, Sredl points out that it cannot find Conol and he believes that Conol has left the country. Because Conol has never been served in this case, the Court will dismiss Sredl's claims against him. The Court will not permit Sredl to pursue liability against Conol when he has not been apprised of the

charges against him. Accordingly, Conol is dismissed from the case and Count III of Sredl's Third Amended Complaint is no longer viable.

## II. Discussion

Prison officials violate a prisoner's Eighth Amendment rights when they exhibit deliberate indifference to the prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976). To demonstrate a constitutional deprivation of rights, a prisoner must prove (1) that the prisoner suffered objectively serious medical needs, and (2) that prison officials actually knew of but deliberately disregarded those medical needs. *Id.* at 106.

Medical malpractice, inadvertent failure to provide medical care, or simple negligence, does not constitute a deliberate indifference toward a prisoner's serious medical needs. *Id.*, at 106 at n.14 (collecting cases); *Escoe v. Wankum*, 21 F.3d 432 (8th Cir. 1994) (citing *Wilson v. Seiter*, 501 U.S. 294 (1991); 111 S. Ct. 2321, 2328 (1991)). Nothing in the Eighth Amendment precludes doctors from exercising their independent judgment and prisoners do not have a right to a particular kind of treatment. *White v. Farrier*, 849 F.2d 322, 327 (8th Cir. 1988) (citing *Noll v. Petrovsky*, 828 F.2d 461, 462 (8th Cir. 1987)). Similarly, a disagreement between the officials and the prisoner about the proper course of treatment does not rise to the level of a constitutional violation. *Warren v. Fanning*, 950 F.2d 1370, 1373 (8th Cir. 1991); *Givens v. Jones*, 900 F.2d 1229, 1233 (8th Cir. 1990). A delay in treatment can constitute deliberate indifference to a prisoner's medical needs, but only where it involves an acute or escalating situation that requires immediate assistance. *Givens*, 900 F.2d at 1233.

12

Sredl asserts three bases for his constitutional claims against Zerrer and CMS: (1) the delay in the original x-ray of his arm and the delay in seeing Conol after his initial appointment with Zerrer; (2) CMS wrongfully refused to provide treatment when Sredl refused to sign the Informed Consent and Release form; and (3) CMS wrongfully failed to follow Kramer's and Turnbaugh's recommendations because it did not provide physical therapy for Sredl's right arm and it did not provide surgery to correct his right arm.

### A. The Delay in X-Ray

The facts are undisputed that Sredl received immediate attention from CMS employees and Zerrer consulted with him the next day. Zerrer treated him, but she ruled out a fracture and she ordered an increase in his pain medication. Zerrer then ordered an x-ray, but Sredl argues she should have expedited it because of the nature of his injury. In her deposition, Zerrer testified she did not believe that a short delay for an x-ray would adversely affect a fractured arm, assuming that conservative treatments were undertaken in the meantime

The heart of Sredl's claim is that Zerrer violated his constitutional rights because she did not immediately order him to undergo an x-ray for his arm. However, his claim ignores Zerrer's testimony that she believed that a brief delay in receiving an x-ray was not unreasonable. Thus, at its worst, Zerrer's conduct constituted a negligent misjudgment. Sredl is essentially arguing that Zerrer made the wrong decision to postpone his x-ray, but he has not offered any evidence that her conduct was knowing or deliberate or that it was anything other than an error in judgment.

13

Sredl does argue that his condition was "acute and escalating" so as to warrant immediate treatment. *Givens*, 900 F.2d at 1233. However, the record reflects that he did receive immediate treatment and there is merely a divergence of opinion about whether that treatment was sufficient. Again, this goes to the standard of care provided by Zerrer and it cannot be the basis for claiming a constitutional deprivation.

Similarly, Zerrer's failure to communicate with CMS staff about Sredl's needs before she left the company and her failure to personally follow up on his condition was, at its worst, negligence. As noted above, this type of conduct cannot serve as the basis for a deliberate indifference claim and Defendants' Motion with respect to the delay in the x-ray will be granted.

The Court acknowledges that "[g]rossly incompetent or inadequate care can constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment." *Warren*, 950 F.2d at 1373 (quoting *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990)). However, there is nothing to suggest that Zerrer's conduct fell so far below the acceptable standard of care so as to suggest that her conduct rose to the level of deliberate indifference. In her deposition, Zerrer came forward with legitimate rationales for her decision-making with respect to Sredl's care, and a reasonable jury could not find that her conduct so veered from the standard that is considered acceptable to suffice for a constitutional violation. As it appears, this is the only claim related to Zerrer and judgment is granted in her favor on Count I of Sredl's Third Amended Complaint.

## B. Informed Consent and Release Form

Sredl next asserts that CMS violated his constitutional rights when Conol refused to apply a splint cast to his right arm because he would not sign the Informed Consent and Release form. According to Sredl, Conol threatened to have him sent to isolation if he failed to sign the form and he verbally abused him.

All of Sredl's claims on this point arise from the conduct of Conol, but he is no longer a party to this case. Thus, the only way to impute liability to CMS is through the theory of *respondeat superior*. However, it is well-established that *respondeat superior* is not a viable means of imputing liability in the section 1983 context. *Smith v. Marcantonio*, 910 F.2d 500, 502 (8th Cir. 1990) (refusing to impute liability to a medical chief of staff for another surgeon's malfeasance) (citing *Givens*, 900 F.2d at 1233). Because courts do not impute liability in the section 1983 context, Sredl's claim against CMS for Conol's conduct fails.

This is particularly true where Sredl has failed to demonstrate or offer any evidence that Conol's conduct was the result of a pattern or practice implemented by CMS. While the use of the Form may be a policy of CMS, Sredl has not offered any evidence that refusing medical treatment based on an inmate's unwillingness to sign the Form is a systemic or official policy implemented by CMS. For example, Sredl has not offered any evidence that other inmates were denied medical care when they refused to sign the Form nor has it submitted any evidence that CMS instructs its doctors to deny medical care to inmates who refuse to sign the Form. Thus, absent a showing that CMS

created a company-wide policy, it cannot be held liable for Conol's behavior.

### C. Failure to Provide Physical Therapy and Surgery

Finally, Sredl asserts that CMS violated his constitutional rights because it did not provide surgery for his right arm, which was suggested by Kramer, nor did it provide him with the physical therapy, which was suggested by Turnbaugh.

Regarding surgery, Defendants stated in their Motion that Kramer recommended against surgery on Sredl's arm because it would lead to additional scarring and pain. *See* Def. SOF [Doc. # 34] at ¶ 53. Sredl did not object or controvert this paragraph and, accordingly, it is an admitted fact. *See* L.R. 56.1(a). Even assuming Sredl did not concede this fact, he stated in his deposition that Kramer did not advise surgery and the only evidence to the contrary is the affidavit he now submits in support of his Opposition. *See* Def. Ex. A at 50:20-21. Thus, Sredl contradicts himself on this fact and he cannot manufacture a factual dispute that warrants denying summary judgment.

Regarding physical therapy, Sredl points to the affidavit of Turnbaugh, suggesting that he would have provided Sredl with physical therapy for his right arm condition. According to Sredl, because Turnbaugh would have implemented a physical therapy regimen, then CMS's failure to do so must have violated his constitutional rights. Again, this constitutes a difference of opinion between Conol and Turnbaugh that, even assuming Turnbaugh is correct and physical therapy was warranted, shows negligence on the part of Conol, but not deliberate indifference. As noted above, divergent views on the proper treatment regimen cannot give rise to an inference of a constitutional deprivation

16

because doctors are allowed to exercise their independent opinions in outlining and moving forward with therapies for their patients who are inmates. Thus, Sredl cannot sustain a claim based on CMS's failure to provide physical therapy.

Additionally, Sredl's claims for CMS's failure to provide surgery and physical therapy are rooted in the conduct of Conol. Sredl argues in his Opposition that Conol deliberately refused to follow the recommendations of Kramer and Turnbaugh and thereby caused him constitutional harm. Assuming that Sredl's argument is correct and the Conol had some evil motive, it nonetheless cannot give rise to liability against CMS because courts do not recognize the theory of *respondeat superior* liability in the section 1983 context. Thus, even assuming Conol's disregard of his colleagues' opinions was infused with malice, it cannot create liability on the part of CMS.

### D. Defendants' Motion to Strike [Doc. # 48]

Because the Court has found the issues in favor of Defendants and granted their underlying Motion, the Court denies their Motion to Strike as moot.

## III. Conclusion

Accordingly, it is hereby

(1) ORDERED that Defendants' Motion for Summary Judgment [Doc. # 34] is GRANTED;

(2) ORDERED that Sredl's claims against Defendant Nelo Conol are DISMISSED; and

(3) ORDERED that Defendants' Motion to Strike [Doc. # 48] is DENIED as

moot.

                                               s/ Nanette K. Laughrey
                                               NANETTE K. LAUGHREY
                                               United States District Judge

DATE:  January 24, 2006
Jefferson City, Missouri

18